32 C.C.P.A. (Patents)

## Application of SPENGLER et al.

### Patent Appeal No. 4957.

Court of Customs and Patent Appeals.

Feb. 7, 1945.

F. Bascom Smith, of New York City (Dale A. Bauer, of New York City, of counsel), for appellants.

W. W. Cochran, of Washington, D. C., for Commissioner of Patents.

Before GARRETT, Presiding Judge, and BLAND, HATFIELD, JACKSON, and O'CONNELL, Associate Judges.

BLAND, Associate Judge.

Claims 1, 3, 5, 7 to 10, inclusive, 16 to 19, inclusive, and 23 to 28, inclusive, of appellants' application for a patent were rejected by the Primary Examiner of the United States Patent Office. Certain claims hereinafter referred to were allowed. Appellants appealed to the Board of Appeals, and the Examiner's rejection of said claims was there affirmed. Appellants then appealed here from the Board's decision.

The application relates to ignition apparatus and more particularly to radio shielding means for electric apparatus such as is used in internal combustion engines, especially for airplanes, where it is important to shield the ignition apparatus in order to avoid interruption of radio reception. Appellants' apparatus comprises a series of conductors gathered together and placed in a ring-like casing, called a harness. The casing may be channel shaped and provided with a cover for removal of the contents of the ring. The wires from the distributor enter the casing through large conduits. These wires are connected with the spark plugs, and they are individually insulated from one another. The whole space within the casing is filled with an insulating compound. The specification discloses or suggests but one such compound, which is a reaction product of polymerized cashew-nut-shell oil with formaldehyde. The casing may be either in

the form of a casting or in the form of a thin-walled tube of brass.

Some of the involved claims are drawn to the first embodiment of the disclosure, which comprises a cast ring-like metallic casing member with removable closure plates. The insulating compound, which acts as a filling material, serves the further purpose of holding the conductors against movement within the casing. Thirteen of the appealed claims relate to the shielding harness and four to the method of producing the same.

The claims were rejected on two grounds: First, that they are unpatentable over either of the patents to Peters et al. in view of the Fletcher patent or of the British patent; second, that they are broader than the invention disclosed. Both grounds of rejection were affirmed by the Board of Appeals.

The references relied upon are as follows: Lamkin et al. (Brit.), 23,413, Nov. 3, 1909; Fletcher, 1,992,656, Feb. 26, 1935; Peters et al., 2,173,539, Sept. 19, 1939; Peters et al. 2,243,881, June 3, 1941.

The claims may be divided into three groups for purposes of treatment. The first group, consisting of 1, 3, 5, and 23 to 28, inclusive, relates to the combination of elements comprising the radio shielding harness. These claims, generally, are drawn to the second embodiment of the disclosure, in which the "rigid metallic manifold casing" is not provided with removable closure plates. The second group consists of claims 7 to 10, inclusive. These claims are also for the article but are specific to a "cast" ring-like metallic manifold casing with "removable closure means", as illustrated in the first embodiment of the disclosure. The third group consists of claims 16 to 19, inclusive, which relate to the method of production.

Claims 1, 8, and 17 are illustrative of the respective groups, and they read as follows:

"1. A radio-shielding harness for the ignition distribution system of an internal combustion engine comprising a rigid metallic manifold casing for enclosing and shielding a plurality of ignition conductors, and *a solid yieldable dielectric material substantially filling said casing around said conductors, said material being in a nonmoldable state* and capable of holding said conductors against movement relative to each other and· to the casing."

"8. In a shielding harness, a *cast* ring-like metallic manifold casing having a substantially channel-shaped radial cross section, a plurality of electrical conductors in said casing extending to outlets in the latter, *yieldable means* in said casing for holding said conductors against vibratory movement relative to each other and to the casing, and *removable closure means* for covering the open side of said casing."

"17. The method of shielding at least one electrical conductor which comprises making a metallic casing, extending a conductor through said casing, *filling said casing around said conductor with a liquid dielectric adapted to solidify through chemical reaction, and applying heat thereto* to accelerate the solidification of said dielectric." [Italics ours.]

The patent to Peters et al., No. 2,173,-539, discloses a radio shielding means of the same general character as that of appellants. The wires in the casing may be bare or insulated individually, and they may be supported within the casing in spaced-apart relation by means of spacing members. The remaining space within the casing is filled with an insulating material in the form of a plastic compound. This compound may consist of a heavy-bodied or polymerized oil, with which may be mixed other ingredients, such as mica, asbestos, rubber, etc. In placing the filler inside the casing, the hollow conduit connected therewith is first exhausted of air, and then the filler compound is forced in under pressure, which, according to the patent, entirely and completely fills the same, and a solid, compact mass is secured throughout.

The patent to Peters et al., No. 2,243,-881, also relates to the insulation of an electric conductor in connection with engine ignition and a radio shielding conduit. The insulating material is made of Bakelite, and the space within the tube is filled with Bakelite in a condition for molding. Powdered Bakelite is ordinarily used, and it is then treated by applying heat and pressure to make it solidify.

The patent to Fletcher treats of a means for insulating conductors in buildings and other structures. Inside the conductor conduits the space is filled with rubber or other insulating medium.

The British patent to Lamkin et al. is concerned with insulated conduits for electrical conductors in buildings, motorcars, or other vehicles. The space within the casing is filled with bitumen or other suitable material. This patent discloses

that the casing may be split into longitudinal sections so that the conductors may be laid in one or more of the sections and the sections then secured together. It also teaches that the insulating material may be introduced in plastic form through a hole formed in the casing. Also, if desired, spacing pieces of insulating material may be provided within the casing to keep the individual conductors apart from one another and from the casing.

All the allowed claims were allowed upon the premise that appellants had disclosed a new insulating material for the interior of the casing—namely, a dry reaction product of cashew-nut-shell oil and formaldehyde. Broader claims were not allowed for the reasons above stated.

For patentability of the article claims, appellants rely, for the most part, upon such broad expressions as a "solid yieldable dielectric material", as in claim 1, "a yieldable, non-moldable unitary solid having dielectric properties", as in claim 25, and "a yieldable dielectric mass having a uniform molecular structure and being in a dry, solid state", as in claim 27. Some of the article claims do not depend upon these features for patentability. For instance, claim 7 calls for a "cast ring-like metallic manifold casing" having "removable closure plates", there being no mention of the filler material.

It was the view of the tribunals below, as it is ours, that appellants' claims are broader than their invention, and that they are substantially met by the prior art cited.

The Board, after briefly discussing the various questions involved, stated that its affirmance of the Examiner's decision was "For reasons more fully expressed by the Examiner".

On the question of the broad claims covering the dielectric insulating material, the Examiner, after pointing out that the earlier Peters et al. patent disclosed a filler which was plastic, the plasticity of which might be varied by proportioning the ingredients, and which was therefore a solid yieldable dielectric material; that the second Peters et al. patent showed Bakelite, a *solid* form of insulation; that the Fletcher patent showed a conduit comprising a plurality of conductors imbedded in an insulating material completely filling all the voids, the material being rubber; and that the British patent disclosed wires inside a metallic casing and insulated therefrom by bitumen or other suitable material, concluded that the claims were not patentable over the prior art cited. This we think was proper.

Appellants argue at great length that their invention is more than merely ascertaining and teaching that an insulating material consisting of a dry reaction product of cashew-nut-shell oil and formaldehyde would accomplish the desired result. They urge that they were the first to do all the things that the claims call for and emphasize the fact of unusual commercial success in the use of their device on airplanes throughout the world. They state that their device has superseded all others, and that it has solved a vexatious problem that had not been previously solved.

Upon appeal to the Board, appellants submitted, in the form of what is styled a "brief", which is verified by oath, a statement of as much information relating to commercial success and the satisfactory operation of their device as was permitted (so they say) in view of the necessities of wartime secrecy. These sworn facts were not considered by the Board, were never before the Examiner, and the record does not disclose any effort on the part of appellants to have the case remanded to the Examiner for consideration of such facts. Under such circumstances we are not privileged to consider them. In re Replogle, 107 F.2d 592, 27 C.C.P.A. (Patents) 704.

The Examiner, in rejecting the broad claims, further stated:

"It is thought that applicants' contribution to the art is merely in the utilization of the reaction product of polymerized cashew-nut-shell oil and formaldehyde as a filling material for ignition harness. The arguments presented by applicants emphasize that many materials were tried out, but the above named material is the only one so far to satisfy the requirements. It logically follows that patent protection should not be extended beyond the particular materials found to work. Accordingly applicants should not be entitled to patent protection to any 'yieldable, non-moldable unitary solid having dielectric properties'. The doctrine of equivalents does not apply here because applicants themselves indicate great research is necessary to find other materials for similar results.

"Even if Peters' (2,173,539) plastic be not as good for preventing chafing and eliminating moisture condensation nevertheless such result may not necessarily follow from 'yieldable non-moldable solid

having dielectric properties' in all cases. It may be true in applicants' case involving the particular reaction product. But they have not shown what other materials would function that way."

Appellants argue that they are entitled to the equivalents of their material; that they have disclosed and are claiming the physical properties thereof; and that the rule that equivalents may not be considered in chemical cases, where research is required, does not apply. It is noted, however, that appellants state that their insulating material "is adapted to solidify within the harness through *chemical* action" [italics ours].

It seems obvious that experimentation to discover the kind of chemical reaction and its effect would be necessary in order to ascertain the desirability of any other material. The record does not show any other material which can be used successfully as a substitute for that which is specifically named in appellants' application. No other material was known to be satisfactory at the time appellants filed their application; and, so far as the record shows, no other material has yet been discovered which will do the same work as the cashew-nut-shell oil preparation. The mere fact that appellants have used "an integral yielding mass of solid dielectric material in a non-moldable state" is no warrant for concluding that they have contributed to the art more than teaching the use of the material named. Sulfur is known to have a chemical reaction with rubber which brings about vulcanization. Surely one cannot claim all materials for vulcanizing rubber, if more than one could perform this function, by describing the yellow, powdery, dissolving nonchemical characteristics of sulfur.

As to the claims in the second group, which do not involve the broad language we have been discussing, we think the tribunals below correctly stated that the fact that the harness was "cast" is a matter of choice and does not involve invention. In view of the prior art cited, patentability is not imparted to those claims by providing a removable closure means on the side of the casing. The term "nonmoldable", according to the Board, is "negative in character". Not only does the prior art show nonmoldable material used for insulating electric wires, but (although perhaps an immaterial consideration) it is not seen just what additional advantage there is in this particular characteristic.

Certainly it is not sufficient to lend patentability to any of the claims.

As for the third group of claims—the method claims—it was the view of the Board, and we think a proper one, that introducing the dielectric as a liquid and permitting it to solidify when cool would be a "likely method" of introducing the bitumen and polymerized oils of the cited prior art references—in other words, it would be the obvious way of doing it. Moreover, we think this feature is substantially anticipated by the first Peters et al. patent. One method claim, No. 20, was allowed, but it included the use of cashew-nut-shell oil. The four appealed method claims are, for the most part, drawn to cover the feature of filling the casing around the conductors with a liquid dielectric adapted to solidify. Other limitations of the method claims, such as applying heat to the mixture after it is in the casing, are either old in the art or so obvious as to fail to lend patentability thereto.

For the reasons stated, the decision of the Board is affirmed.

Affirmed.